Patience Gore, Plaintiff, Pro Se

10945 Price Manor Way, Apt. 219

Laurel, Maryland 20723

patie_g@yahoo.com | 210-913-0275


Olaoluwa Omotosho, Plaintiff, Pro Se

10945 Price Manor Way, Apt. 219

Laurel, Maryland 20723

patie_g@yahoo.com | 210-913-0275

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Patience Gore; Olaoluwa Omotosho,

*Plaintiffs,*

v.

United Airlines, Inc.,

*Defendant.*

**CV26-05066-PHX-DJH**

THIS DOCUMENT IS <u>NOT</u> IN PROPER FORM ACCORDING TO FEDERAL AND/OR LOCAL RULES AND PRACTICES AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE LR Civ l 5.4
_____
(Rule Number/Section)

Civil Action No. _____

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Patience Gore and Olaoluwa Omotosho bring this action against Defendant

United Airlines, Inc. and allege as follows:

## INTRODUCTION

1

1. This action arises from Defendant United Airlines, Inc.'s alleged misuse of its passenger-announcement authority to summon Plaintiff Patience Gore to a gate counter under the appearance of an airline-related purpose, where three men later understood to be officers of U.S. Immigration and Customs Enforcement approached and detained her immediately upon her arrival.

2. Both Plaintiffs had completed check-in, checked baggage with United, and received boarding passes reflecting confirmed adjacent seat assignments. They presented those boarding passes at airport security and entered the secured boarding area without being advised of any issue. United had identified no ticketing, seating, baggage, identification, check-in, reservation, or boarding issue requiring Plaintiff Gore's presence at the gate counter.

3. United nevertheless repeatedly summoned Plaintiff Gore by name to the gate.

4. When Plaintiff Gore complied, United's gate agent began referring to her boarding pass but identified no defect or other airline-related issue before the three men immediately approached her.

5. The three men were not dressed in readily identifiable law-enforcement uniforms and did not display badges, credentials, or other visible identification to Plaintiffs before directing Plaintiff Gore to accompany them.

6. United did not summon Plaintiff Olaoluwa Omotosho, although Plaintiffs were traveling together on the same reservation, Plaintiff Omotosho had purchased both tickets, and Plaintiffs occupied adjacent seats.

7. Plaintiffs do not allege that United was prohibited from communicating truthfully with law enforcement or complying with lawful requests.

8. Plaintiffs' claims do not rest on the fact of communication alone. Whatever assistance may have been requested, United retained control over how it exercised its own passenger-announcement authority and used that authority in a manner that created the appearance of legitimate airline business when no airline-related issue was identified.

9. The targeted summons of Plaintiff Gore alone, the reference to her boarding pass without any stated defect, the three men's near-simultaneous approach, the immediate cessation of the airline interaction, and United personnel's apparent lack of surprise support a reasonable inference that the encounter was anticipated.

10. The detention that followed lasted nearly two weeks—from March 16 through March 27, 2026—and forced Plaintiff Gore to abandon a time-sensitive IVF cycle. She incurred legal expenses to secure her release and, after resuming fertility treatment, underwent a replacement cycle that required additional medications, monitoring, medical procedures, physical burden, emotional strain, and expense. The incident caused substantial personal, medical, reproductive, psychological, family, professional, and economic harm.

11. Plaintiff Omotosho witnessed the detention, was unable to complete the planned travel with his wife, incurred expenses in Arizona, experienced employment disruption, assumed sudden caregiving and household responsibilities, and suffered impairment of the marital and family relationship.

## JURISDICTION AND VENUE

12. This Court has original subject-matter jurisdiction over Plaintiff Patience Gore's claims under 28 U.S.C. § 1332(a)(2).

13. Plaintiff Gore is a citizen of Zimbabwe domiciled in Maryland. Defendant United Airlines, Inc. is incorporated under the laws of Delaware and has its principal place of business in Chicago, Illinois, and is therefore a citizen of Delaware and Illinois under 28 U.S.C. § 1332(c)(1).

14. The amount in controversy as to Plaintiff Gore exceeds $75,000, exclusive of interest and costs.

15. This Court has supplemental jurisdiction over Plaintiff Olaoluwa Omotosho's claims under 28 U.S.C. § 1367(a) because those claims arise from the same incident and form part of the same Article III case or controversy as Plaintiff Gore's claims.

16. This Court has specific personal jurisdiction over United because United purposefully conducted airline and gate operations in Arizona, and Plaintiffs' claims arise directly from conduct allegedly undertaken by United personnel concerning Flight UA483 at Gate E7 at Phoenix Sky Harbor International Airport.

17. Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred at or near Gate E7 at Phoenix Sky Harbor International Airport in Phoenix, Arizona, within this District.

## PARTIES

18. Plaintiff Patience Gore is a citizen of Zimbabwe domiciled in Maryland.

19. Plaintiff Olaoluwa Omotosho is a citizen of the United States domiciled in Maryland, is therefore a citizen of Maryland for purposes of diversity jurisdiction, and is Plaintiff Gore's husband.

20. Defendant United Airlines, Inc. is a commercial air carrier incorporated under the laws of Delaware, with its principal place of business in Chicago, Illinois, that operates airline services in Arizona and throughout the United States.

21. At all relevant times, United acted through its employees, agents, gate personnel, supervisors, and other representatives acting within the course and scope of their employment or agency and in furtherance of United's operations.

## FACTUAL ALLEGATIONS

22. On or about March 15, 2026, Plaintiffs were scheduled to travel on United Airlines Flight UA483 from Phoenix Sky Harbor International Airport.

23. Flight UA483 was scheduled to depart at approximately 11:40 p.m. on March 15, 2026, and was later delayed to approximately 12:01 a.m. on March 16, 2026.

24. The events alleged occurred at or near Gate E7 within the secured boarding area used by United for Flight UA483.

25. Plaintiffs were returning home after attending a friend's wedding.

26. Plaintiff Omotosho purchased both airline tickets.

5

27. Plaintiffs were traveling together as husband and wife on the same reservation.

28. Before proceeding to Gate E7, both Plaintiffs had completed check-in. United had accepted their checked baggage at the check-in counter, and each Plaintiff had received a boarding pass reflecting a confirmed seat assignment.

29. The boarding passes assigned Plaintiffs adjacent seats: 14B for Plaintiff Gore and 14C for Plaintiff Omotosho.

30. Before United summoned Plaintiff Gore, United had not communicated to either Plaintiff any issue concerning their tickets, boarding passes, checked baggage, identification, boarding eligibility, seat assignments, reservation, or check-in status. Plaintiff Gore had not engaged in disruptive conduct, refused any airline instruction, or been advised of any operational, safety, or security concern.

31. United nevertheless summoned only Plaintiff Gore.

32. United repeatedly announced, "Passenger Patience Gore, please come to the gate," or words to that effect.

33. Upon information and belief, personalized gate announcements directing identified passengers to report to a gate are initiated or controlled by airline personnel and require an intentional decision to summon the passenger.

34. Plaintiff Gore reasonably understood the repeated announcement to mean that an airline-related matter required her presence at the gate counter.

35. Plaintiff Gore did not knowingly or voluntarily present herself to law enforcement. She presented herself to United because United summoned her under the appearance of an airline instruction.

36. Plaintiff Omotosho accompanied Plaintiff Gore and personally observed the interaction.

37. Upon Plaintiff Gore's arrival at the gate counter, the United gate agent began referring to her boarding pass.

38. Before the gate agent identified any defect or explained any airline-related reason for the summons, the three men immediately approached Plaintiff Gore.

39. The boarding-pass interaction ceased at once. United personnel did not resume or complete it and did not thereafter identify any airline-related issue requiring Plaintiff Gore's presence.

40. The three men were later understood to be officers of U.S. Immigration and Customs Enforcement.

41. The three men were not wearing readily identifiable law-enforcement uniforms or other clothing clearly identifying them as law-enforcement officers, and they did not display badges, credentials, or other visible identification to Plaintiffs before directing Plaintiff Gore to accompany them.

42. The men stated, "Ma'am, you're going to need to come with us," or words to that effect. At that point, Plaintiff Gore understood that she was not free to leave or decline to accompany them, and the men immediately assumed control over her movement.

43. In Plaintiffs' presence, United personnel did not ask the men to identify themselves, ask why they were taking Plaintiff Gore, inquire whether any airline matter remained unresolved, question the interruption of the purported

boarding-pass interaction, or respond to Plaintiff Gore's immediate removal from the gate counter. United personnel did not disclose that the summons was connected to law enforcement.

44. After Plaintiff Gore was taken into custody, Plaintiffs remained in the terminal for a period of time while Plaintiff Omotosho sought information concerning her detention. During that time, neither Plaintiff heard any further announcement requesting that either Plaintiff return to the gate or complete the purported airline-related matter for which Plaintiff Gore had been summoned. Nor did either Plaintiff hear any final or individualized boarding call requesting that either of them return to Gate E7 to board Flight UA483.

45. Taken together, the near-simultaneous intervention, abrupt cessation of the purported airline interaction, absence of any identified airline issue, absence of any visible surprise or inquiry by United personnel, and absence of any further call concerning the purported airline matter or final boarding while Plaintiffs remained in the terminal support a reasonable inference that the encounter was anticipated.

46. At the time of detention, neither Plaintiff was presented with a judicial warrant, administrative warrant, court order, or other legal process authorizing Plaintiff Gore's detention.

47. Plaintiff Omotosho requested documentation and an explanation for taking Plaintiff Gore into custody, but the men provided neither at the scene.

48. Counsel later requested production of any warrant or other asserted legal basis supporting the detention. No warrant or other authorizing legal process was produced to Plaintiffs or their counsel in response.

49. In subsequent habeas proceedings challenging Plaintiff Gore's continued confinement, the government did not oppose her release, and she was released after the habeas action was filed. Plaintiffs do not allege that the government's non-opposition, standing alone, establishes that the initial detention lacked lawful authority.

50. The detention was initiated immediately after Plaintiff Gore complied with United's targeted summons and arrived at the gate counter.

51. Upon information and belief, United personnel received or acted upon information concerning the anticipated law-enforcement encounter before the announcement and used United's passenger-announcement authority to cause Plaintiff Gore to appear at the anticipated location and time. Personalized gate announcements are directed to a specifically identified passenger. The three men's immediate approach upon Plaintiff Gore's response to United's personalized announcement supports a reasonable inference that they were awaiting her appearance at the gate counter rather than encountering her by happenstance.

52. The existence and content of any pre-encounter communications, instructions, or information exchanges are principally within the possession of United and governmental actors. Plaintiffs' allegation of advance coordination is supported by the combined circumstances alleged above: United summoned Plaintiff Gore alone

despite the shared reservation and adjacent seating; identified no airline-related issue; began referring to her boarding pass but never supplied an explanation or identified a defect; and the interaction ceased when the three men approached immediately upon her arrival. United personnel displayed no apparent surprise and made no inquiry. While Plaintiffs remained in the terminal, neither Plaintiff heard any further call concerning the purported airline matter or final boarding.

53. Whatever assistance law enforcement may have requested, and regardless of whether the officers possessed lawful authority, United controlled how it exercised its own passenger-announcement authority. United used that authority to cause Plaintiff Gore to appear at the gate counter without disclosing that the summons was connected to an anticipated law-enforcement encounter.

54. United identified no airline-related reason for the summons, no defect in Plaintiff Gore's boarding pass or reservation, and no other airline matter requiring her presence. Its use of apparent airline authority secured Plaintiff Gore's compliance.

55. Before United summoned Plaintiff Gore, the three men had not approached her. She went to the gate counter because United called her by name; absent that summons, she would not have appeared at that location at that time.

56. Upon Plaintiff Gore's arrival, the three men immediately approached her and assumed control over her movement. The purported boarding-pass interaction ceased without United identifying any airline-related issue.

57. United therefore did more than passively permit the encounter: it affirmatively caused Plaintiff Gore to appear at the location where the confinement was

immediately initiated. That sequence, together with the surrounding circumstances alleged above, supports a reasonable inference that United anticipated and facilitated the encounter.

58.    United knew or should have known that a passenger personally summoned to the gate would understand the announcement as an official airline instruction and comply, and that using that authority for an anticipated law-enforcement encounter created a risk of detention, loss of liberty, humiliation, family separation, travel disruption, and resulting economic and emotional harm.

59.    Plaintiff Gore was detained for nearly two weeks, from March 16 through March 27, 2026, and remained continuously in federal immigration custody from the gate detention until her release.

60.    Plaintiff Gore was initially held at a detention facility in Florence, Arizona, for approximately three days and was then transferred to the Eloy Detention Center, where she remained until her release.

61.    During the first days of confinement, Plaintiff Gore was held continuously indoors, subjected to repeated lockdowns, confined in a locked room, and required to sleep on a mattress placed directly on the floor.

62.    She was denied a change of clothing and basic personal necessities, required to use an exposed toilet without meaningful privacy, and issued previously worn intimate garments, including undergarments.

63.    Plaintiff Gore underwent an unclothed search in connection with visitation procedures and was transported while restrained at her wrists, waist, and ankles.

11

64. She was subjected to a meal schedule that included breakfast as early as approximately 4:00 a.m., lunch at approximately 11:00 a.m., and dinner at approximately 4:00 p.m., causing prolonged overnight hunger, sleep disruption, and physical discomfort.

65. Plaintiff Gore has astigmatism and light sensitivity. Although she requested access to her sunglasses, she was denied them and experienced severe headaches when exposed to the Arizona sun.

66. Concerns arose regarding Plaintiff Gore's access to necessary medical care and prescribed medication, which Plaintiff Omotosho communicated while attempting to obtain information and assistance.

67. Plaintiff Gore remained without a meaningful explanation for why she was being held and without an effective means of obtaining release apart from legal intervention.

68. Plaintiff Gore was separated from her husband and minor child throughout the detention.

69. At the time of her detention, Plaintiff Gore was actively undergoing a time-sensitive IVF protocol. She had devoted months to preparatory care and medical optimization and was continuing fertility-related medications, supplements, nutritional measures, and other treatment intended to optimize egg quality and readiness for retrieval.

70. The detention abruptly interrupted that protocol. Plaintiff Gore lost access to prescribed medications, physician-directed supplements, nutritional measures, and

other components of her treatment regimen. Instead, she was subjected to acute stress, disrupted sleep, irregular meals, and the conditions of confinement alleged above.

71. Plaintiff Gore was forced to abandon the prepared IVF cycle, losing both the benefit of months of preparation already undertaken and the opportunity to complete the cycle under the planned medical and temporal conditions.

72. Within several weeks after her release, Plaintiff Gore resumed fertility treatment and underwent a replacement IVF cycle without the opportunity to repeat the same months of uninterrupted preparation that had preceded the abandoned cycle.

73. The replacement cycle required additional medications, monitoring, medical procedures, physical discomfort, emotional strain, and substantial expense. It produced no viable embryo.

74. The replacement cycle did not restore the prepared cycle or the distinct, time-sensitive reproductive opportunity it represented. Plaintiffs do not presently allege that the detention caused the biological outcome of the replacement cycle. Their claimed injuries include the forced abandonment of the prepared cycle, the loss of that reproductive opportunity, the interruption and delay of treatment, and the additional expense and physical and emotional burdens required to resume treatment.

75. Plaintiff Gore incurred legal expenses in challenging the detention and obtaining her release.

76.    Plaintiff Gore's confinement disrupted her employment and professional obligations and prevented her from fulfilling scheduled responsibilities.

77.    Following release, Plaintiff Gore experienced anxiety associated with air travel and psychological triggers involving airports, passenger announcements, hearing her name called publicly, gate counters, and law-enforcement presence.

78.    She also experienced sleep disturbance, nightmares, physical stress symptoms, fear, vulnerability, and loss of emotional security that continued beyond her release.

79.    Plaintiff Omotosho was unable to complete the scheduled travel with Plaintiff Gore and remained in Arizona for approximately one week, incurring lodging, meals, transportation, replacement clothing, personal necessities, and incidental expenses.

80.    Plaintiff Omotosho missed time from a newly commenced position during a critical early period of employment.

81.    While Plaintiff Gore remained detained, Plaintiff Omotosho returned home separately to care for the couple's minor child and assumed sole caregiving, household, and logistical responsibilities.

82.    Plaintiff Omotosho personally witnessed United summon Plaintiff Gore and the three men take her into custody. The detention and resulting separation substantially disrupted the parties' marital and family relationship.

83.    Plaintiffs were required to travel separately after Plaintiff Gore's release, causing additional expense and logistical disruption.

## NATURE OF THE CLAIMS

84.    Plaintiffs' claims arise from United's allegedly misleading use of its passenger-announcement authority to direct a specifically identified passenger to an anticipated law-enforcement encounter. The claims arise under generally applicable Arizona tort law and do not seek to regulate United's prices, routes, flight schedules, boarding priorities, aircraft operations, aviation-safety standards, or ordinary provision of air transportation.

## COUNT I

## NEGLIGENCE—MISLEADING USE OF PASSENGER-ANNOUNCEMENT AUTHORITY

### Plaintiffs Against United

85.    Plaintiffs incorporate paragraphs 1 through 84 as though fully set forth herein.

86.    Plaintiffs were United's ticketed passengers. The carrier-passenger relationship required United to exercise reasonable care in its direct passenger-facing interactions with them, including its use of the gate-announcement system to direct an identified passenger within the secured boarding area to report to United personnel. Because United initiated and controlled the manner in which the summons was conveyed, that duty extended to its words, manner, and apparent purpose.

87. United breached that duty by summoning Plaintiff Gore under the appearance of a boarding-pass or other airline-related issue when United had identified no such issue, and by using its apparent airline authority to secure her compliance with an immediate law-enforcement encounter without disclosing the connection. The circumstances alleged above support a reasonable inference that United personnel anticipated the encounter.

88. Count I does not depend on whether the officers possessed lawful authority to detain Plaintiff Gore. It challenges United's own means of causing her to appear at the gate counter—its allegedly misleading use of passenger-facing authority—not the government's decision to detain her.

89. United knew or should have known that Plaintiff Gore would understand the personalized announcement as an official airline instruction and comply promptly, and that using that authority for an anticipated law-enforcement encounter created an unreasonable risk of detention, loss of liberty, humiliation, family separation, travel disruption, and resulting economic and emotional harm.

90. United's summons caused Plaintiff Gore to leave her prior location and appear at the gate counter where the detention was immediately initiated. Absent that summons, she would not have appeared at that location at that time.

91. The officers' immediate intervention was not an independent or extraordinary event outside the risk created by United's alleged conduct. It was the very encounter United allegedly anticipated and facilitated: three officers approached Plaintiff Gore immediately upon her arrival, directed her to accompany them, and

assumed control over her movement as the purported airline interaction abruptly ceased. The officers' role in deciding and physically effectuating the confinement therefore does not necessarily sever causation as to United's alleged conduct.

92.    Plaintiff Gore seeks damages resulting from the ensuing continuous detention to the extent those damages are proven to have been proximately caused by United's conduct. Independently, she seeks damages directly attributable to United's allegedly misleading summons and role in initiating the confinement, including loss of autonomy, public humiliation, immediate loss of liberty, travel disruption, and resulting consequential injuries. Her negligence claim does not depend on proving that United controlled every subsequent governmental custody decision.

93.    Plaintiff Omotosho seeks recovery for unreimbursed travel, lodging, meals, transportation, personal necessities, employment-related losses, and other damages proximately caused by United's alleged negligence, to the extent established and recoverable under Arizona law.

## COUNT II

## FALSE IMPRISONMENT—PLEADED IN THE ALTERNATIVE

### Plaintiff Gore Against United

94.    Plaintiff Gore incorporates paragraphs 1 through 93 as though fully set forth herein.

17

95. False imprisonment consists of detention without the person's consent and without lawful authority.

96. Plaintiff Gore did not consent to being detained and was deprived of her liberty for nearly two weeks, from March 16 through March 27, 2026.

97. Upon information and belief, the initial detention was without lawful authority. That allegation rests on the absence of any contemporaneously disclosed legal basis or authorizing process, the failure to identify or produce any warrant or other asserted authorization after counsel requested it, and the government's subsequent non-opposition to Plaintiff Gore's release. The government's non-opposition does not, standing alone, establish that the initial detention was unlawful. The precise authority asserted for the detention, the facts on which the officers or other responsible decisionmakers relied, whether the requirements of any asserted detention authority were satisfied, and what, if anything, was communicated to United concerning that authority are principally within the possession of governmental actors and United.

98. A person or entity that actively participates in, procures, or instigates an unlawful confinement may be liable even when another person performs the physical restraint. Count II does not rest on United's mere provision of information or passive cooperation with law enforcement. It rests on United's alleged active use of its passenger-facing authority to procure Plaintiff Gore's appearance for an anticipated confinement.

99. United did more than provide information or leave the officers to locate or approach Plaintiff Gore. Upon information and belief, United personnel anticipated immediate restraint and used United's passenger-facing authority to summon her under the appearance of airline business to the gate counter, where the officers immediately assumed control over her movement.

100. Plaintiff Gore complied with United's summons and was immediately detained. Absent the summons, she would not have appeared at that location at that time.

101. Plaintiff Gore does not allege that United controlled the subsequent governmental custody decisions. She seeks damages proximately caused by United's alleged role in procuring the initial confinement, including damages arising from the ensuing detention to the extent established through discovery and recoverable under applicable law.

## COUNT III

### LOSS OF CONSORTIUM

### Plaintiff Omotosho Against United

102. Plaintiff Omotosho incorporates paragraphs 1 through 101 as though fully set forth herein.

103. At all relevant times, Plaintiff Omotosho was married to Plaintiff Gore.

104. Plaintiff Gore suffered substantial injury as a direct and proximate result of United's alleged tortious conduct, including detention, loss of liberty,

psychological injury, family separation, medical disruption, and loss of a time-sensitive reproductive opportunity.

105. As a direct and proximate result of those injuries, Plaintiff Omotosho suffered loss and impairment of love, affection, companionship, care, society, protection, support, services, marital comfort, emotional support, household partnership, and family stability.

106. Plaintiff Omotosho was abruptly separated from his wife, assumed sole responsibility for the couple's child and household, and experienced substantial disruption of the marital relationship.

107. The forced abandonment of the IVF cycle, the loss of the distinct reproductive opportunity it represented, and the additional physical, emotional, and financial demands of undergoing a replacement cycle further impaired the parties' marital and family relationship.

108. Plaintiff Omotosho is entitled to recover loss-of-consortium damages in an amount to be determined by the jury.

## PUNITIVE DAMAGES

109. Plaintiffs incorporate paragraphs 1 through 108 as though fully set forth herein.

110. Upon information and belief, United personnel knew that no genuine airline-related issue required Plaintiff Gore's presence and nevertheless knowingly used the appearance of an airline instruction to cause her to appear for an anticipated law-enforcement encounter.

111. Upon information and belief, those personnel consciously disregarded the substantial risk that misleadingly invoking United's passenger authority for that purpose would expose Plaintiff Gore to detention, loss of liberty, humiliation, family separation, and significant personal harm.

112. The personnel who authorized or carried out the summons acted within the course and scope of their employment or agency and in furtherance of United's business and operations.

113. Plaintiffs seek punitive damages only if clear and convincing evidence establishes that the United personnel responsible for the summons acted with the culpable state of mind required under Arizona law and that punitive liability may properly be imposed upon United for that conduct.

### DAMAGES

114. Plaintiffs seek compensatory and consequential damages for injuries and losses proximately caused by United's alleged conduct, including losses resulting from the ensuing continuous detention, to the extent established through discovery and permitted by law.

115. Plaintiff Gore's damages include, but are not limited to:

a. Loss of liberty for nearly two weeks, from March 16 through March 27, 2026;

b. Public humiliation associated with being summoned by name and detained at an airport gate;

c. Degrading confinement conditions, including prolonged indoor confinement, repeated lockdowns, sleeping on the floor, lack of clothing changes and personal necessities, previously worn intimate garments, exposed toilet facilities, an unclothed search, transport while restrained at the wrists, waist, and ankles, hunger, sleep disruption, and denial of requested sunglasses despite light sensitivity;

d. Physical discomfort, severe headaches, and physical stress symptoms;

e. Legal expenses reasonably incurred in obtaining release, to the extent recoverable as consequential damages;

f. Loss of a time-sensitive IVF cycle, including the benefit of months of completed and ongoing preparatory care and medical optimization, and the distinct reproductive opportunity that cycle represented;

g. Interruption of fertility-related medications, supplements, nutrition, and other treatment preparation, together with treatment delay and resumption of treatment under materially different medical and temporal circumstances;

h. Additional medications, monitoring, medical procedures, physical discomfort, emotional strain, and treatment expenses associated with the replacement IVF cycle;

i. Separation from her minor child and husband;

j. Emotional and psychological injury, including anxiety, fear, sleep disturbance, nightmares, physical stress symptoms, humiliation, loss of emotional security, and

22

*Dated: July 17, 2026*
Respectfully submitted,



_____

Patience Gore, Plaintiff, Pro Se

10945 Price Manor Way, Apt. 219

Laurel, Maryland 20723

patie_g@yahoo.com | 210-913-0275


_____

Olaoluwa Omotosho, Plaintiff, Pro Se

10945 Price Manor Way, Apt. 219

Laurel, Maryland 20723

patie_g@yahoo.com | 210-913-0275